Filed 12/16/21  Britton v. Riggs CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| LAYNE LESLIE BRITTON, | B303446 |
| Plaintiff, Cross-Defendant, and Respondent, | (Los Angeles County Super. Ct. No. BC496298) |
| v. | |
| CONRAD RIGGS et al., | |
| Defendants, Cross-Complainants, and Appellants. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Frederick C. Shaller, Judge.  Reversed and remanded.

Browne George Ross O'Brien Annaguey & Ellis, Eric M. George and Richard A. Schwartz for Defendants, Cross-Complainants, and Appellants.

Quinn Emanuel Urquhart & Sullivan, Christopher Tayback, Valerie Roddy, Aaron Perahia for Plaintiff, Cross-Defendant, and Respondent.

_____

Conrad Riggs and Cloudbreak Entertainment, Inc. (Cloudbreak) appeal from a judgment entered in favor of plaintiff and cross-defendant Layne Leslie Britton, contending the trial court erred in denying their motion for summary adjudication of Britton's breach of contract cause of action and granting the motion for summary adjudication filed by Britton. Britton filed suit against Riggs and Cloudbreak for various claims arising out of an alleged breach of a consulting agreement the parties entered into with respect to services to be provided by Britton on the television reality series *Survivor* and other matters. Riggs and Cloudbreak cross-complained against Britton, who was an attorney, asserting claims for professional negligence, breach of fiduciary duty, restitution, and alleging Britton provided legal services to Riggs and Cloudbreak pursuant to a written contingency fee agreement that did not satisfy the requirements imposed on such agreements by Business and Professions Code section 6147.[1]

The trial court granted Britton's summary adjudication motion and denied the summary adjudication motion filed by Riggs and Cloudbreak, finding Britton served as a business consultant, not an attorney, and therefore the consulting

_____

[1]     All further undesignated statutory references are to the Business and Professions Code.

agreement was not voidable.  Following the court's ruling, a jury found for Britton on his claims for breach of contract and money had and received, awarding him $489,850 in damages.

On appeal, Riggs and Cloudbreak contend Britton provided legal services under the consulting agreement and the agreement therefore was voidable by Riggs and Cloudbreak.  We agree and reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Britton's Services for Riggs and Cloudbreak*[2]
1.    *The players and deal to produce the reality series* Survivor

Britton graduated from law school in 1981.  Britton was admitted to the California bar, but he pursued a career as a television executive.  Britton worked as vice president of business affairs at NBC Entertainment and later at CBS, before he became the executive vice president of business operations for UPN.  Although Britton never worked for a law firm or as a solo practitioner and never made a court appearance or served as counsel of record, he was at all relevant times an active membership in the California bar.

Riggs graduated from law school in 1989, after which he worked as a transactional attorney at two law firms and later for a sports agency.  In 1998 Riggs and his production company, Cloudbreak, began working with Mark Burnett to produce reality television shows, including *Survivor*.  Riggs and Burnett pitched

---

[2]    This discussion is based on undisputed facts taken from evidence submitted in connection with the summary adjudication motions.

*Survivor* to several networks, including to UPN where Britton was then executive vice president of business operations. Britton suggested Burnett and UPN equally share the responsibility for securing advertisers for the show and split the advertising profits. UPN ultimately declined to produce the show, but in 1999 Burnett finalized a deal with CBS on *Survivor* (*Survivor* agreement), which included a similar shared advertising provision.

2.      *Britton advises Riggs regarding disputes with CBS*

On March 25, 1999 Riggs contacted Britton by email seeking Britton's advice on which attorney to hire for the "CBS/*Survivor* deal."[3] *Survivor* premiered on CBS in 2000. In the summer of 2000 Riggs contacted Britton regarding CBS's demand that Burnett reduce his share of the profit on advertising revenues from 50 percent to 25 percent. CBS indicated it would not sell any additional advertising units for *Survivor* if Burnett did not agree to the reduction. Britton advised Riggs to instruct Burnett not to agree to any reduction. CBS ultimately sold additional advertising, and Burnett maintained his 50 percent share of profit on advertising revenues.

Shortly thereafter, discussions began between Burnett and CBS over the renewal of *Survivor* for additional seasons. The *Survivor* agreement required Burnett and CBS to negotiate a settlement as to compensation for future cycles of *Survivor* and to arbitrate their dispute if no agreement could be reached. During the settlement discussions, the law firm Irell & Manella

---

[3]      The record does not reflect whether Britton provided advice in response to the email.

4

represented Burnett, while also providing legal advice to Riggs and Cloudbreak. Britton also provided advice to Riggs and Burnett regarding the dispute over future cycles. According to Riggs, Britton "offered to help [Riggs] with the renegotiation instead of [Riggs] hiring . . . another lawyer." Riggs told Britton he wanted Britton to be his lawyer and added, "[I]f you help me, I'm not going to hire another lawyer, so you're going to do this work, whatever it is."

On behalf of Burnett and Riggs, Britton engaged in negotiations with Les Moonves, who at the time was president and chief executive officer of CBS television, regarding a renewal contract for *Survivor*. When no settlement was reached, Burnett and CBS scheduled an arbitration for January 2001. During the arbitration process the law firm O'Donnell & Shaeffer represented Burnett and Riggs. However, Riggs continued to receive advice from Britton regarding the dispute.

On July 5, 2000 Britton wrote an email to Riggs, titled "What To Do To Maximize the Success of *Su[r]vivor* and *Eco Challenge*," advising Riggs to "[b]e patient at CBS with *Survivor*. . . . You have arbitration as your protection." (Italics added; capitalization omitted.) Britton noted the arbitrator could award a larger payment to Burnett than the 50-50 advertising revenue split, suggesting that during the arbitration "[y]ou will argue that you should be paid more. [¶] . . . To support this you can point to many examples of successful shows where the cost to the networks is f[a]r more onerous than the arrangement you have at present. . . . [¶] . . . There is nothing that says a license fee cannot include ratings performance payments." In the same email, Britton proposed various television networks where Burnett and Riggs might pitch several new show ideas. Britton

advised, "If there are any shows here you like, you should try to sell them now for the 50/50 advertiser deals. Do this for two reasons. One, you can confirm rumors that this is the deal at CBS without violating your confidentiality clause [in the *Survivor* agreement]. Two, you will have a basis of comparison for the arbitrator."

On July 8, 2000 Riggs sent Britton an email asking him to review a draft email to CBS employee Marc Graboff in response to Graboff's email objecting to the proposed licensing fee for future cycles of *Survivor* that took into account past advertising revenues. Britton responded to Riggs, "Please add that they have in fact offered payments directly related to advertising revenue by offering to pay bonuses based on ratings and ratings are of course a large part of the total advertising revenue. [¶] Please co[n]sider whether you want to start this now or wait until next week. Don't show them your thought process this early. [¶] Consider going right to arbitration with no notice of your coming arguments." Four days later, Britton provided Riggs with notes on a revised draft email to Graboff. Regarding a $1 million cost deduction by CBS in the first cycle accounting for *Survivor*, Britton proposed adding, "You failed to list even one example of what entity had ever[] been charged these costs and more importantly c[o]uld not show where in the contract CBS c[a]n deduct thes[e] cost[s] even if they w[e]re ordina[r]y and custom[a]r[y]." (Capitalization omitted.)

On July 27, 2000 Britton sent Riggs an email with the subject line "*Survivor* letter for counter." (Italics added.) Britton suggested adding a cover letter "[e]xplain[ing] that you think it reflects the intent of the parties at the time the deal was made to reward [Burnett] for performance since he took the risk of selling

6

the time" and "[e]xplain[ing] that the rights [to *Survivor*] should belong to [Burnett] because he will make it his business to build a business that maximizes these rights. [Burnett] will use his personal selling skills to sell and build the *Survivor* brand along with other brands like *ECO-Challenge*." (Italics added.)

On September 26, 2000 Britton sent Riggs an email with a subject line reading, "Ready For Arbitration." Britton listed several points for Riggs to consider regarding the arbitration with CBS, including that the dispute "can be settled any time before the judgment is issued" and "[d]on't put a number on the table that is not reflective of the value of *Survivor*." (Italics added.)

### 3. *Britton helps Riggs and Burnett pitch and sell additional television shows*

Around September 2000 Britton also helped Burnett and Riggs develop and attempt to sell additional show ideas. Britton arranged a meeting with Garth Ancier at NBC to pitch a reality television show called *Destination Mir*. That month NBC agreed to develop the show. Britton helped negotiate with Ancier a 50-50 advertising revenue split between NBC and Burnett's affiliated company, DJB, Inc. In early October 2000 Britton suggested Riggs and Burnett work on a professional wrestling television show and set up a pitch by contacting Ted Turner.

### 4. *Britton advises Riggs regarding disputes with Castaway*

On October 5, 2000 Britton sent Riggs an email regarding a dispute between DJB and Castaway Television Productions, Limited (Castaway) with respect to Castaway's right to a share of Burnett's payments from CBS for *Survivor*. Britton's email

7

contained the subject line "Privileged and Confidential," and it attached a document titled "Privileged and Confidential.doc." The attached document began, "Privileged and Confidential [¶] Notes on possible ways to respond to the Castaway letter . . . ." In the document, Britton described "[b]ad news about the letter," including that the "aggressive[ness]" of the letter indicated "[Castaway is] very confident or very worried that they have a good claim. If they felt that they were in the middle on the strength of their argument then they would I think be more conciliatory in their tone and tactics." Britton noted the letter contained "the claim that Castaway owns the rights for [*Destination Mir*]. This could kill the deal at NBC . . . . Mark will have to disclose these claims. Mark will not get [insurance] coverage for them. . . . We are very vulnerable on this point." Britton also described "go[o]d news in the letter" in that "[i]t clearly admitted that there is an agreement that as drafted does not entitle Castaway to any part of [Burnett's] money from CBS. [¶] Calling it a mutual mistake is a complete loser of an argument . . . ." Britton concluded, "The goal is to get this response out with a tone that communicates a disregard for their claims if we can find some good facts . . . ." (Capitalization omitted.)

On October 6, 2000 Britton sent Riggs an email with suggested edits to a "PRIVILEGED AND CONFIDENTIAL" letter drafted by an attorney for Irell & Manella on behalf of DJB addressed to Castaway's attorney in which DJB challenged Castaway's position that a "key provision" of the format rights agreement between Castaway and DJB—limiting Castaway's compensation for *Survivor*—was "a result of mutual mistake." Britton added the following underscored language to one portion

8

of the letter, which argued the agreement's "definition of 'Format Participation' . . . is clear on its face and . . . <u>accurately and</u> correctly <u>memorializes and</u> reflects the <u>many discussions, agreement of the parties and therefore</u> [the] intention of Mr[.] Burnett, Mr. Riggs and DJB." Britton also inserted, "Your reliance on prior agreements between the parties is also misplaced. As you will note, not only does the agreement have a merger clause, it was Mr. Parsons himself who pointed out in his September 8, 1999 email to Mr. Riggs that the Format License was intended to 'replace' the parties['] prior agreements." Britton added, "If you seek reformation, we are confident an arbitrator will find that the nature of Castaway's format license agreements mandates a reformed agreement consistent with Castaway's other agreements. That is, a license agreement where Castaway does not participate in network revenues." Britton added the following underscored language to another portion of the letter regarding Castaway's claims to *Destination Mir*: "[I]f these claims ever have the effect of impacting Mr. Burnett's ability successfully to produce *Destination Mir*, we will hold Castaway<u>, its partners and all related persons, entities and representatives</u> strictly accountable for all consequences . . . ." (Italics added.) Britton further added language that "the complicated nature of CBS's matching rights in the international territories . . . might prevent Castaway from extending current format licenses." On the final page of the document, Britton included a comment to Riggs and Burnett, "Do not have your lawyers invite settlement discussions. It then goes to the firms that are paid by the hour and will just joust with each other. []Get rid of the settlement language . . . ." (Capitalization omitted.)

5. *DJB's agreement with Cloudbreak and Britton and Cloudbreak's consulting agreement for Britton's services*

On September 20, 2000 Riggs sent Burnett a letter "confirm[ing] [their] agreement regarding the compensation DJB, Inc. will pay Cloudbreak . . . for business/production/distribution consulting services" related to *Survivor* and other shows. According to Riggs's letter, Burnett agreed that DJB would pay Cloudbreak "an amount equal to 10% of all sums received by DJB from these projects." The letter stated, "Unless and until we sign a more formal agreement, this letter shall replace our prior oral agreement and constitute the entire agreement between us."

Until late October 2000, Britton and Riggs had no agreement regarding Britton's compensation for his services to Riggs and Cloudbreak. Up to this point, Britton had not been paid for his services. In October 2000 Britton provided to Riggs a draft agreement regarding Britton's services. Under the draft agreement, Cloudbreak was to pay Britton 35 to 40 percent of Cloudbreak's earnings for Britton's services to Burnett and DJB. Riggs hired attorney Samuel Spira and law firm Gorrey & Meyer to review the draft agreement. According to Riggs, he attempted to negotiate Britton's compensation to "the standard entertainment lawyer percentage of 5 or 10 percent," but Britton refused.

On October 23, 2000 Cloudbreak and Britton entered into a "consulting agreement" (capitalization omitted), under which Britton was to provide "business advisory and consulting services" to Riggs and Cloudbreak "on projects Cloudbreak undertakes for Mark Burnett and DJB Inc." through December 31, 2001 (the Agreement). The Agreement provided,

10

"Notwithstanding anything to the contrary in this Agreement, the parties acknowledge that, within Cloudbreak, Britton shall render his services only to Conrad Riggs and shall render services to third parties as directed by Cloudbreak."  The Agreement provided as to compensation, "Commencing July 1, 2000, Cloudbreak shall pay Britton 40% . . . of the gross compensation . . . Cloudbreak receives from DJB . . . or other third party sources in connection with services Cloudbreak provides to DJB relating to" other DJB projects.  The agreement specifically provided Britton would be compensated for several television projects, including *Survivor* and *Destination Mir*, but specified as to *Survivor* that Britton would receive 35 percent of the gross compensation received by Cloudbreak from DJB, rather than 40 percent, subject to certain exclusions.  The Agreement made "[a]ll sums due to Britton in connection with this Agreement . . . due and payable upon Cloudbreak's receipt of its compensation from DJB or any other sources."

Paragraph 4 of the Agreement provided, "Britton and Cloudbreak represent and warrant and it is a material inducement to this Agreement that (a) each is an independent contractor and not an agent, partner, joint venture partner, common law employee or representative of the other . . . ." (Underscoring omitted.)

Paragraph 9 provided, "This Agreement constitutes the entire understanding of the parties hereto and supersedes all prior agreements, understandings, discussions, statements and negotiations of the parties relating to the subject matter herein and may only be varied by a written instrument signed by both parties."

11

Paragraph 10 provided, "Cloudbreak and Britton shall maintain the financial terms of this Agreement . . . in strict confidence and shall not disclose the existence of the terms of this Agreement, except to the extent required by law or to assert or defend any claims, or, if required by a financial institution for personal financial investment or personal banking purposes or to fulfill the obligations under this [A]greement. Notwithstanding the foregoing, Cloudbreak will disclose the existence and non-financial terms of this Agreement to Mark Burnett no later than December 10, 2000. Britton's services to O'Donnell & Shaeffer and/or to Irell & Manella and retention as an expert consultant and/or expert witness in connection with certain disputes involving DJB are permitted disclosures hereunder and shall not violate the terms of this Agreement. Such disclosures by Cloudbreak and services to O'Donnell and/or Irell & Manella, however, will not in any way change, alter or waive Cloudbreak's or Britton's confidentiality obligations as described in this paragraph. Notwithstanding the foregoing, Cloudbreak acknowledges people are and will continue to become aware through Britton's performance of his services hereunder that Britton is rendering personal consulting services to Cloudbreak in connections with the projects described herein."

The Agreement did not state that Britton's fee was negotiable between Britton and Cloudbreak (and not set by law), and it did not state to what extent Cloudbreak could be required to pay Britton compensation for related matters not covered by the Agreement.

6.     *Britton continues to advise Riggs regarding the CBS arbitration and the dispute with Castaway*

After execution of the Agreement, Britton continued to advise Riggs with respect to DJB's disputes with CBS and Castaway.  On October 31, 2000 Britton sent Riggs an email with notes on a draft letter from attorney Pierce O'Donnell of O'Donnell & Shaeffer on behalf of Burnett to CBS's counsel expressing disappointment with CBS's failure to agree to the terms set forth in its broadcast license fee agreement with Burnett for production of *Survivor*.  Britton inserted a note to Riggs, "You have to decide what you want to do about suing for re[s]cission.  I am opposed to seeking this relief.  There is no way [Burnett] will support more than a million dollars in legal fees and years of waiting while the litigation proceeds.  I think Viacom will not be bullied by the threat and will let the efforts to go to court instead of arbitration become a new battle ground.  I am interested in hearing what [O'Donnell] has to say on this matter.  I think [the attorney's] advice is not good here." (Capitalization omitted.)  As to the letter's assertion CBS had failed timely to compensate Burnett, Britton commented, "My suggestion here is don't beat [CBS] up to[o] hard for nonpayment, but, rather again press the attack on the issue of the lack of an accounting, this they are weak on, make reference to the written requests by date[] and the oral promises that have been made about w[h]en they would [be] sent." (Capitalization omitted.)  Britton continued, "[M]ake the point that you want all the money in accordance with the side letter and you are . . . will[ing] to indemnify them."  Britton recommended the letter include "actu[a]l language from the agreement. . . .  You do not want their lawyers saying you are just posturing.  Make them explain away

to [Moonves] the language that says the show can be sold else[where] if CBS passes on the decision.  Claim this is what was discussed in the negotiations at the time since you would not agree to the offers they w[ere] making and were willing to let a third party decide what is fair."  (Capitalization omitted.)

On November 2, 2000 Britton sent Riggs an email attaching Britton's comments on a (significantly) revised draft of O'Donnell's letter to CBS's counsel.  Britton inserted the following underscored language:  "CBS has . . . <u>refused to recognize in the negotiations the fair market value of the show. In direct contr[a]diction of the good[ ]faith intention of the fully negotiated terms under which the show[']s worth is to be determined</u> . . . ."  (Capitalization omitted.)  Britton also inserted that CBS's conduct was "a violation of the terms of the agreement r[e]garding sharing in the advertising" and "CBS continues to insist upon deducting over [$]1,000,000 in normal network costs that are not permitted under the *Survivor* Agreement." (Capitalization omitted, italics added.)  As to the letter's threat that if CBS failed to pay an arbitrator's award for fair market value, Burnett would shop *Survivor* to other networks, O'Donnell commented that he and Shaeffer did not think the threat should be included in the letter; Britton wrote in response, "I think you should make the claim."  (Capitalization omitted.)  Britton also suggested the letter quote the arbitration provisions of the *Survivor* agreement.

On November 3, 2000 Britton provided additional notes on yet another draft of the letter.  Riggs sent his and Britton's comments to O'Donnell and the legal team, with a copy to Britton.  Britton's comments and revisions included: "stay away from their strength i.e. a license fee is not the same as revenue

14

share"; "[CBS has] failed to negotiate in good faith in accordance with the intent of the parties as reflected in the [*Survivor*] Agreement so that the financial rewards would be fairly shared"; "remind CBS that any claims that Castaway has made for a portion of the revenue from the network [are] mistaken and that Mark has in the side letter promised to indemnify [CBS] against any incorrect payments"; and "CBS may choose not to abide by the arbitrator opinion and thereby forgo its broadcast rights to the program."

In November 2000 Riggs asked Britton to meet with the owners of Castaway regarding Burnett's dispute with Castaway. On November 7 Riggs sent to Britton a draft email for Britton to send to Castaway's owners. The email stated, "I am contacting you on behalf of Mark Burnett and Conrad Riggs . . . . [¶] I would like to speak to you directly regarding finding ways for . . . you to work with [Burnett] and [Riggs]. I am not their attorney and I am not part of their law firm, Irell & Manella. I have known Conrad for many years and Mark for over two years. I from time to time answer questions for them as a 'friend of the court.' [¶] . . . [I]t would be much more fruitful for both parties to find a business resolution instead of a legal one . . . ." The same day, Britton sent the email as drafted by Riggs to Castaway's owners, copying Riggs.

On November 8, 2000 Britton sent Riggs an email "outlin[ing] the things that I believe will motivate CBS to settle and the things that I believe CBS is counting on to win if there is arbitration." Britton highlighted the "need to show the arbitrator the value of the show in the open market as provided in the [*Survivor*] agreement." Britton opined CBS would want to avoid "gossip" about the dispute, and "[t]here is I think no

15

confidentiality in the [*Survivor*] agreement regarding anything other than the economic terms so [CBS's] behavior could be discussed very publicly. If this could also produce a credible discussion of punitive damages because CBS is consistently bad[,] great. I doubt any compensatory damages could be proven because I think it would be difficult to prove economic harm." Britton then noted the language in the *Survivor* agreement— providing the arbitrator with "authority to set the Broadcast License Fee up to an amount no greater than the amount then being paid by CBS for any similar programming"—favored CBS in the arbitration. Britton listed the positions he expected CBS to take in the arbitration and the best responses to each.

On November 10, 2000 Britton sent Riggs another email regarding the upcoming arbitration with CBS. Britton attached to the email a document titled "outline of CBS and Burnett arrangement for *Survivor*." (Capitalization omitted, italics added.) The document began, "Listed here are reasons for [Moonves] to decide the terms of the deal rather than an arbitrator." In the document, Britton analyzed the terms of the arbitration provision of the *Survivor* agreement. Britton noted the outcome of the arbitration was uncertain, stating, "Both sides have arguments that make some sense. A similar show is really best described as a very successful show." Britton wrote, "The agreement invites the arbitrator to look at amounts other networks pay. The 'up to' limiting amount being paid by CBS to be effective must have similar programming and since CBS does not have any similar programming the limit will not apply. . . . So the provision makes sense as a mechanism to provide for payment when CBS does not have similar programming. . . . Remember the phrase in the agreement is 'fair market' value that

16

includes the criteria of 'reputation of the Producer in the television industry.' . . . [T]his is again a reason for the arbitrator to not be limited by the phrase [']similar show[,'] since there is no similar show when all the factors [in the *Survivor* agreement] are considered." Britton noted, "[T]he agreement has the very broad arbitration provision that looks at so many elements and gives the arbitrator so much information. . . . Even if the arbitrator mistakenly rules that a direct portion of the revenue is not due as a bonus[,] the amount to be paid for the total weekly fee could easily be in the multiple of millions and cost CBS more in the future if the show continues . . . . Remember the arbitration is after each cycle." Britton continued, "I have fought to hold the letter your lawyers asked to sen[d] because of its claim that CBS engages in fraud . . . . There are many examples, without mentioning fraud, of bad things CBS has done . . . . There has been no reasonable accounting. There has been no payment even though the letter provides that Mark indemnifies CBS against any claims Castaway might make against it . . . . There are copyright claims for the VH-1 *Survivor* show. Let's keep all the stuff private." (Italics added.) Later that day, Britton sent Riggs a revised version of the document, to which Britton added under a heading titled "Certainty," "There are claims to be raised that have as a remedy re[sci]ssion. The amount at stake is so high why risk it." (Capitalization omitted.)

On November 21, 2000 Riggs sent Moonves at CBS a spreadsheet prepared by Britton showing projected revenues for *Survivor* based on different economic assumptions.

On November 25, 2000 Britton sent Riggs an email expressing his concerns about a letter from attorney John Shaeffer of O'Donnell & Shaeffer to CBS's counsel demanding

CBS release money it was withholding that was owed to Burnett. Britton wrote, "I want to talk to [Shaeffer] . . . . I want to know what the strategy is they are following at this point. I want a mock argument to be made Monday. I see no understanding on their part regarding the strengths and weaknesses of the case. I do not see that they have any understanding of the arguments I put forth in the desperate hours of those first drafts they prepared that said nothing. I am concerned that they are not tough enough for the fight ahead. It will be won on the contract if at all[,] not from any posturing or intimidation." Two days later Britton sent Riggs an email, copied to O'Donnell and Sheffer, commenting on another draft letter from O'Donnell to CBS's counsel again objecting to CBS withholding payment to Burnett. Britton commented, "My advice here is to disregard this whole line of attack." (Capitalization omitted.)

The same day Riggs forwarded to Britton an email from an attorney at O'Donnell & Shaeffer containing a list of criteria for expert witnesses for the arbitration. Britton responded, "I will call them." Britton then contacted at least two possible experts for the arbitration, including retired television executive Larry Hoffner, who later drafted a declaration for the arbitration.

On November 30, 2000 Britton sent Riggs an email, copied to O'Donnell and Shaeffer, with a document titled "notes on attack." In the document, Britton advised Riggs, "[T]hey must be arguing that the fair market value for the show is less than they paid for the first cycle. I think this is a goofy argument for them to be making and I am not sure they have thought it through. [¶] Our point is that we don't really care if the deal is directly for advertising. . . . We need to abandon what the structure of the deal is and let CBS rail on form over substance."

Also on November 30, Shaeffer sent an email to Britton, copied to O'Donnell, stating, "I completely agree with your analysis. I have never wanted to argue that an advertiser supplied is the same as a license fee. Rather I wanted to argue what a fair market value is. [¶] A key point of [your] analysis is that a comparable license fee is not simply what is paid on any give[n] show, but rather what a network would pay for a show hitting the market that had under its belt a season like *Survivor* did last year . . . ." (Italics added.)

On December 11, 2000 Britton sent Shaeffer an email with a copy to Riggs, providing comments on a draft joint proposed order for the arbitration with CBS. Britton identified the scope of the confidentiality clause as a problem for information gathering and the engagement of experts. Britton wrote, "I need to talk to people without . . . the restriction of confidentiality." Around December 26, 2000 Britton reviewed a draft declaration of expert witness Larry Hoffner prepared to support Burnett's claims in the arbitration.

In early January 2001 CBS and Burnett settled their dispute over future cycles of *Survivor*. Britton continued to advise Riggs on other disputes with CBS, while also preparing pitch materials for other shows with Burnett and Riggs.

On March 23, 2001 Britton provided notes on a draft letter from O'Donnell & Shaeffer to an arbitrator regarding a dispute between Burnett and CBS over *The Survivor Phenomenon*, an hour-long program aired by CBS about the first season of *Survivor*. Britton wrote, "Is not the issue here not who produced [*The Survivor Phenomenon*] but that CBS aired it? . . . They have an obligation to charge for the rights to maximize [their revenue] . . . . The affiliate [who produced *The Survivor*

19

*Phenomenon*] would not be free to use the rights and material if it was for some other network." (Capitalization omitted.) Regarding the letter's assertion the parties did not contemplate a mid-season "derivative" show, Britton commented, "I will bet they knew they wanted to rest the show so they could [get it into] sweeps and did not [tell] you. This could be import[a]nt later if you challenge the settlement as fraudul[e]nt." (Capitalization omitted.)

### 7. *Cloudbreak's payments to Britton*

Britton made repeated requests for payment for the second cycle of *Survivor*. Beginning on January 31, 2003 and continuing until December 18, 2006, Cloudbreak made periodic payments to Britton's company, LLB Services, Inc., totaling $1,877,000. On the invoice accompanying each of the 11 checks issued during this period, Cloudbreak specified as the description, "Legal fees." (Capitalization omitted.)

## B. *The Complaint and Cross-Complaint*

Britton filed this action on November 27, 2012 against Riggs and Cloudbreak. Britton's operative second amended complaint alleged causes of action for breach of contract, conversion, open book account, money had and received, quantum meruit, fraud, and receipt of stolen property. Britton alleged he provided business advisory and consulting services to Cloudbreak pursuant to the Agreement. Riggs made "interim payments to Britton for cycles of *Survivor*—which continued through 2006. . . . Riggs represented (falsely and with the intent to deceive Britton) that these payments were 35% of the monies he received for each cycle of *Survivor*." Britton alleged Riggs filed suit against

20

Burnett, and the two later settled. Riggs misled Britton to believe he was no longer receiving payments from Burnett although Cloudbreak was continuing to receive *Survivor* payments directly from CBS. Britton alleged Cloudbreak failed to perform its obligations under the Agreement, including failing to account for moneys received from Burnett, withholding money it owed Britton, failing to consult with Britton about Riggs's dispute with Burnett, and settling that dispute without obtaining Britton's consent. Britton further alleged the Agreement entitled him to payments for several shows Burnett produced after *Survivor*. Britton sought damages exceeding $16 million.

In January 2013 Riggs and Cloudbreak filed a cross-complaint against Britton. Their operative first amended cross-complaint alleged causes of action for professional negligence, breach of fiduciary duty, declaratory relief, and unjust enrichment/restitution. Riggs and Cloudbreak alleged they retained Britton to provide legal and business assistance "in various matters," including negotiations and the arbitration with CBS regarding *Survivor*. Britton caused Riggs and Cloudbreak to enter into the Agreement, which "was unfair, unreasonable, unconscionable, and illegal," and voidable as a contingency fee agreement for legal services that did not comply with section 6147. Riggs and Cloudbreak further alleged Britton failed to advise them that their agreement with Burnett was similarly voidable by Burnett for failure to comply with section 6147, which "forced [Riggs and Cloudbreak] to settle their lawsuit with Burnett for less than its worth."

21

C.    *The Parties' Motions for Summary Adjudication*

On July 17, 2015 Britton moved for summary adjudication of the following issue central to Riggs and Cloudbreak's counterclaims and affirmative defenses: "No fiduciary duty or attorney-client relationship existed between Britton, on the one hand, and Cloudbreak Entertainment, Inc. and Conrad Riggs, on the other, because Britton was not their attorney." Britton argued he did not owe Riggs and Cloudbreak a fiduciary duty because the Agreement did not create a duty and he did not practice law on their behalf. According to Britton's supporting declaration, he "never . . . practiced law at any job in any capacity." Britton averred further, "In the course of rendering my services to Burnett, his affiliated companies, Riggs, and Cloudbreak, I did not consult legal texts, treatises, statutes or case law."

On the same date Riggs and Cloudbreak moved for summary adjudication of Britton's breach of contract cause of action based on voidability of the Agreement as a contingency fee agreement that failed to meet the requirements of section 6147.[4] Riggs stated in his supporting declaration, "At all times during which Britton advised Cloudbreak, I (and Cloudbreak) believed that an attorney-client relationship existed between Britton and

---

[4]    Riggs and Cloudbreak also moved for summary adjudication of Britton's causes of action for breach of contract, open book account, money had and received, and quantum meruit on the basis the claims were barred by the applicable statutes of limitation. They also argued Britton's causes of action for open book account and money had and received failed "to constitute a cause of action." The trial court denied Riggs and Cloudbreak's motion on these issues.

Cloudbreak." Riggs averred, "[F]rom July 2000 through 2002 . . . , Cloudbreak, acting through me, continually sought, received, and relied upon Britton's legal advice and legal acumen."

In opposition to Britton's motion, Riggs and Cloudbreak filed excerpts from the deposition of Riggs, in which he addressed the July 7, 2000 email he drafted and Britton sent to Castaway's owners, in which Britton stated he was not Burnett's and Riggs's attorney. Riggs testified, "[Burnett] asked me to make sure [Britton] said that he doesn't represent both of us. He didn't want any impression that [Britton] represented Mark Burnett, so he said, 'Tell them that he doesn't represent both of us.'" Riggs and Cloudbreak also relied on the same evidence they submitted in support of their motion for summary adjudication.

In his declaration in opposition to Riggs and Cloudbreak's motion, Britton stated, "To the extent I made comments on letters or other documents prepared by Burnett's attorneys, those comments were based on the law and legal concepts that Burnett's attorneys had explained to me." Britton also relied on the same evidence he submitted in support of his motion for summary adjudication.

D.      *The Trial Court's Ruling on the Motions*

On October 1, 2015 the trial court granted Britton's motion for summary adjudication and denied Riggs and Cloudbreak's motion for summary adjudication of Britton's breach of contract claim. In its written ruling, the court found there was no triable issue of fact whether there was an attorney-client relationship between the parties because Britton did not act as attorney for Riggs or Cloudbreak. The court relied on the language of the

23

Agreement, which provided that Britton would render "business advisory and consulting services," and did not include "[t]he phrases 'legal services,' 'legal advice' and 'legal representation.'" Further, the Agreement stated that Britton and Cloudbreak were independent contractors and "not agents, partners, joint venture partner[s], common law employees or representatives of the other," thereby "disclaim[ing] a fiduciary relationship." The court reasoned the disclaimer was effective because the contract did not "'require legal services' or even purport to offer them."

The trial court noted Riggs was himself an attorney and Cloudbreak was represented by attorneys with respect to negotiation of the Agreement. The court also relied on the November 7, 2000 email drafted by Riggs and sent by Britton to Castaway's owners, in which Britton stated he was not an attorney for Riggs or Burnett. The court found Britton "was not a practicing lawyer" despite being an active member of the California Bar, because Britton had never worked for a law firm and never "made a court appearance [or] served as counsel of record" in any court. The court found Britton's work for Riggs and Cloudbreak "did not require [Britton] to do any legal research or cite cases," but rather, it consisted of "participating in negotiations, providing economic models (spreadsheets) and pitching new show ideas on Burnett projects." The court reasoned Britton's negotiations were based on his "knowledge of the economics underlying the television business and his strong relationships in the television business. Anyone who understands the television business could have engaged in the negotiations that Britton did, as proven by the fact that" Britton negotiated with non-lawyers on behalf of Riggs and Cloudbreak. The court concluded, "Negotiating is not the practice of law." The

24

court denied Riggs and Cloudbreak's motion for summary adjudication of Britton's breach of contract cause of action on the same grounds.

E. *The Jury Trial, Verdict, and Posttrial Proceedings*

Prior to the start of the jury trial, the trial court reserved for a bench trial Britton's claim that Riggs and Cloudbreak were equitably estopped from asserting the statute of limitations as a defense and Britton's claim that Riggs was the alter ego of Cloudbreak.

In February 2016 a jury trial proceeded on Britton's causes of action for breach of contract against Cloudbreak and money had and received against Cloudbreak and Riggs.[5] The jury found for Britton on both claims. The jury found Britton's breach of contract claim was barred by the statute of limitations to the extent it alleged harm that occurred before June 14, 2008; the jury awarded Britton $0 for past economic loss suffered before that date and $489,850 for past economic loss suffered thereafter. On Britton's claim for money had and received, the jury found the statute of limitations barred the alleged harm to Britton that occurred before June 14, 2009, and it awarded Britton $0 in damages. On March 14, 2016 the trial court entered a judgment on the jury's verdict.

---

[5] On March 19, 2015 the trial court sustained a demurrer filed by Riggs and Cloudbreak to Britton's causes of action for conversion and receipt of stolen property without leave to amend. The court also granted a motion to strike the cause of action for fraud on the ground that Britton had added the cause of action to his second amended complaint without being granted leave to add a new claim.

25

Britton filed a motion for a new trial, arguing the damages awarded by the jury were inadequate as to both causes of action and the jury's verdict was contrary to law because its finding that part of Britton's claimed harm occurred before June 14, 2008 was inconsistent with its finding that Britton suffered no damages prior to that date. The trial court granted a new trial on Britton's claim for money had and received on the ground that the jury's damages award was inadequate and inconsistent with its finding of liability on that claim. The court also concluded the jury's verdict was ambiguous as to whether its liability finding applied to Cloudbreak only or to both Cloudbreak and Riggs. The court denied the motion as to Britton's claim for damages for breach of contract. In ruling on the motion, the court also found that Riggs and Cloudbreak were not equitably estopped from asserting a statute of limitations defense to Britton's claims.

On May 3, 2016, the trial court issued an order taking the parties' respective motions for attorneys' fees off calendar pending a retrial on the claim for money had and received. The court also ordered that the bench trial on Britton's alter ego claim be reserved pending resolution of Riggs and Cloudbreak's intended appeal.

F.     *The Parties' Premature Appeal and Subsequent Proceedings*

In December 2018 we reversed the trial court's order on Britton's motion for a new trial, concluding it was premature and therefore void. We dismissed the parties' cross-appeals from the judgment entered on the jury's verdict, concluding the judgment was not appealable because it was not a final judgment in light of the trial court's failure to hold a bench trial on the reserved issues. (*Britton v. Riggs, supra,* B272078.)

26

On remand, the trial court found against Britton on the reserved issues of equitable estoppel and alter ego. Britton again moved for a new trial. Riggs and Cloudbreak moved for judgment notwithstanding the verdict, arguing Britton's claim for money had and received was duplicative of his breach of contract claim, and therefore could not result in another recovery. Each side filed a motion for attorneys' fees.

The trial court denied Britton's motion for a new trial and his request for prejudgment interest. The court granted Cloudbreak's motion for judgment notwithstanding the verdict, but denied the motion as to Riggs. The court denied each side's motion for attorneys' fees, finding there was no prevailing party for purposes of attorneys' fees recovery.

The trial court entered judgment on October 17, 2019 and an amended judgment on January 10, 2020. Britton timely appealed. Riggs and Cloudbreak timely cross-appealed.[6]

## DISCUSSION

A. *Standard of Review*

Summary adjudication is appropriate only if there are no triable issues of material fact and the moving party is entitled to

---

[6]     In accordance with the parties' proposals for a briefing sequence, we ordered the parties to brief Riggs and Cloudbreak's cross-appeal (this appeal) before briefing commences on Britton's appeal. Britton's appeal is taken from the October 17, 2019 judgment, the November 20, 2019 order denying Britton's motion for attorneys' fees, the December 10, 2019 order granting in part Riggs and Cloudbreak's motion for judgment notwithstanding the verdict, and the December 11, 2019 order denying Britton's motion for a new trial and request for prejudgment interest.

judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1085.)  "'"""We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained."'  [Citation.]  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party."'"" (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; see accord, *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 607).)

The party moving for summary adjudication has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; *Valdez v. Seidner-Miller, Inc., supra*, 33 Cal.App.5th at p. 607.)  If the moving party satisfies this initial burden, the burden shifts to the opposing party to present evidence demonstrating there is a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Valdez*, at p. 607.) We liberally construe the opposing party's evidence and resolve any doubts about the evidence in favor of that party.  (*Regents of University of California v. Superior Court, supra*, 4 Cal.5th at p. 618; *Valdez*, at p. 608.)

Where the facts are undisputed, "[t]he existence of an attorney-client relationship involves a question of law that we review de novo." (*Sprengel v. Zbylut* (2019) 40 Cal.App.5th 1028, 1042; accord, *Wood v. Superior Court* (2020) 46 Cal.App.5th 562,

580.) "[A]ny conflict in the evidence of an attorney-client relationship is a question of fact for the trial court to decide, which we uphold if supported by substantial evidence." (*Sprengel*, at p. 1042.)

B.      *The Trial Court Erred in Determining the Undisputed Facts Do Not Show Britton Provided Legal Services to Cloudbreak*

"An attorney-client relationship is not created by the unilateral declaration of one party to the relationship." (*Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 729; accord, *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 959 [individuals cannot unilaterally create an attorney-client relationship without the agreement of the attorney].) "Rather, the relationship can only be created by contract, express or implied." (*Koo*, at p. 729; accord, *Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1732; *Fox,* at p. 959.) "'When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*.'" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1148; accord, *Wood, supra*, 46 Cal.App.5th at p. 581 ["Ordinarily, when a party seeks legal advice from a lawyer, and the lawyer provides such advice, an attorney-client relationship is formed."]; *Benninghoff v. Superior Court* (2006) 136 Cal.App.4th 61, 72 (*Benninghoff*).)

Riggs and Cloudbreak contend the trial court erred in determining they did not have an attorney-client relationship with Britton because the evidence shows Riggs sought legal advice from Britton (on behalf of Cloudbreak), and Britton provided it. Britton counters that his services consisted only of negotiating, providing economic models, and pitching new show

29

ideas, none of which constituted the practice of law. Britton also argues the Agreement demonstrates he never agreed to act as Cloudbreak's attorney. Riggs and Cloudbreak have the better argument.

It is true "when the attorney acts merely as a negotiator for the client or is providing business advice," the relationship between the parties "is not one of attorney-client." (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 735; accord, *Watt Industries, Inc. v. Superior Court* (1981) 115 Cal.App.3d 802, 805 [attorney-client privilege did not attach "where . . . the attorney act[ed] merely as a business agent for the client in conveying the client's position to a contracting party"].) And it is undisputed that some portion of Britton's services consisted of conducting negotiations regarding *Survivor* and using his business connections to assist the sale of television shows in development by Riggs and Burnett. But a substantial portion of Britton's services involved providing advice on arbitration strategy, crafting legal arguments based on interpretation of the *Survivor* agreement, reviewing and critiquing letters drafted by Burnett's counsel, and drafting a memorandum assessing the validity of Castaway's claims, all of which are archetypal legal advice a lawyer would provide a client. Britton does not dispute he provided these services pursuant to the Agreement.

That Britton never appeared in court or practiced at a law firm does not alter the character of the services he provided. The practice of law includes not only ""the doing and performing services in a court of justice,"" but also the provision of "legal advice . . . whether or not . . . rendered in the course of litigation." (*Birbrower, Montalbano, Condon & Frank v. Superior*

30

*Court* (1998) 17 Cal.4th 119, 128; accord, *People v. Merchants Protective Corp.* (1922) 189 Cal. 531, 535 [the practice of law "'includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured although such matter may or may not be []pending in a court'"].) "[T]he resolution of legal questions for another by advice and action is practicing law 'if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the application of a trained legal mind.'" (*Baron v. City of Los Angeles* (1970) 2 Cal.3d 535, 543; see *Altizer v. Highsmith* (2020) 52 Cal.App.5th 331, 341 [assisting in renewal of judgment by filling in factual information about original judgment and renewal on two-page Judicial Council form was "'clerical'" work that did not require resolution of ""'"difficult or doubtful legal questions'"" that might ""'"reasonably demand the application of a trained legal mind,"'"" and thus was not the unauthorized practice of law].)

It is undisputed that at the inception of the professional relationship memorialized in the Agreement, Riggs told Britton, "[I]f you help me, I'm not going to hire another lawyer, so you're going to do this work, whatever it is." Following Riggs's statement, Britton began to provide a mix of business and legal advice to Cloudbreak through Riggs. The professional services provided by Britton as to the CBS dispute required him to interpret the *Survivor* agreement, and based on that agreement, to advise Riggs and Cloudbreak as to arbitration strategy, to gather evidence in support of the arbitration's goals (including interviewing two potential expert witnesses, one of whom provided a declaration supporting Burnett's position), and to evaluate the relative strength of Burnett's and CBS's legal

31

arguments. Britton evaluated the scope of the arbitrator's authority, as well as CBS's rights in relation to the arbitrator's decision. He also advised as to the scope of the confidentiality clauses in existing and proposed agreements. Britton noted the possibility of seeking punitive damages, at the same time opining that compensatory damages would be unavailable "because . . . it would be difficult to prove economic harm."

As to Castaway, Britton drafted a legal memorandum evaluating the merits of Castaway's claimed rights to *Survivor*. He labeled his October 5, 2000 cover email and attached memorandum to Riggs as privileged and confidential.[7] In his memorandum, Britton opined that Castaway's affirmative defense of mutual mistake with respect to the format rights agreement with DJB was "a complete loser of an argument." He then suggested edits to a draft letter to Castaway's attorney marked privileged and confidential that DJB's attorney at Irell & Manella had drafted, addressing Castaway's claim of mutual mistake. Britton noted the format rights agreement had a merger clause, and he suggested adding to the letter an argument why the arbitrator would not order reformation of the agreement. With respect to Castaway's claims to *Destination Mir*, Britton suggested making clear that DJB intended to hold not only Castaway accountable for any losses, but "its partners and all related persons, entities and representatives" as well. He counseled against initiating settlement discussions with Castaway, and emphasized, "The goal is to get this response out

---

[7]    In deposition testimony, Britton did not deny designating the document as privileged and confidential but stated, "I don't know what privileged and confidential means."

32

with a tone that communicates a disregard for their claims if we can find some good facts . . . ."

Britton repeatedly employed principles of contract interpretation to fashion legal arguments Burnett and Cloudbreak could assert. For example, in November 2000 Britton sent a memorandum to Riggs regarding the upcoming CBS arbitration that analyzed the arbitration provision of the *Survivor* agreement. With respect to the dispute over payments for renewal of *Survivor* for future cycles, Britton focused on the term "similar show" (referencing the parties' agreement that limited the arbitrator's award of licensing fees to what CBS paid for similar programming) to argue the term would not limit the arbitrator's award because "there is no similar show when all the factors are considered," in light of *Survivor*'s success and Burnett's reputation. Britton later provided legal arguments and critiqued those asserted by the O'Donnell & Shaeffer attorneys on multiple drafts of a letter to CBS, in which Britton commented to Riggs on Burnett seeking rescission of the agreement, "I think [the attorney's] advice is not good here." Britton suggested the letter quote from the *Survivor* agreement, highlight what was discussed at negotiations, argue that CBS had violated the agreement as to "sharing in the advertising," "stay away from their strength," and remind CBS of Burnett's side letter promising to indemnify CBS against any incorrect payments.

Britton points to the statements in his declaration that his "comments on letters or other documents prepared by Burnett's attorneys . . . were based on the law and legal concepts that Burnett's attorneys had explained to me." But this statement runs contrary to the undisputed evidence that Britton disagreed with the legal judgments made by those attorneys. In addition to

33

the examples above, Britton asserted Burnett's attorneys misunderstood the legal effect of Burnett's agreement to indemnify CBS against Castaway's claims, directing them to "look at the language again in the side letter." And Britton repeatedly insisted the attorney correspondence he reviewed quote and rely more directly on contract language, rather than "posturing or intimidation." He counseled against making direct accusations of fraud against CBS, while flagging evidence that could be used to challenge the settlement reached with CBS regarding future cycles of *Survivor* as fraudulent.

*Aetna Casualty & Surety Co. v. Superior Court* (1984) 153 Cal.App.3d 467 is instructive. There, an insurance company asserted attorney-client privilege over its former attorney's files regarding the attorney's investigation of an insurance claim. The company had hired the attorney to conduct the investigation and make a coverage determination under the policy. In concluding the documents were protected by the attorney-client privilege, the court reasoned, "The attorney was given a legal document (the insurance policy) and was asked to interpret the policy and to investigate the events that resulted in damage to determine whether Aetna was legally bound to provide coverage for such damage." (*Id.* at p. 477.) The court observed, "This is a classic example of a client seeking legal advice from an attorney." (*Ibid.*) Here, Britton interpreted the agreements with CBS and Castaway, opined about the respective rights of the parties to the agreements, and crafted arguments in support of Cloudbreak, Riggs, and Burnett.

Britton relies on paragraph 4 of the Agreement, which disclaims any agency or representative relationship between Britton and Cloudbreak, to argue the Agreement could not create

34

an attorney-client relationship, which is premised on agency principles. But as the Court of Appeal observed in *Benninghoff, supra,* 136 Cal.App.4th 61, a written disclaimer does not prevent the existence of an attorney-client relationship if the attorney is in fact performing legal services or offering legal advice. (*Id.* at p. 73 & fn. 10; see State Bar Standing Com. on Prof. Responsibility and Conduct, Formal Opn. No. 1999-154 ["no disclaimer [of an attorney-client relationship] will be effective if [attorney] is in fact performing legal services or offering legal advice"].) Britton attempts to distinguish *Benninghoff* as involving a contract that "require[d] legal services" (*Benninghoff* at p. 73), whereas the Agreement does not contain such a requirement. This is a distinction without a difference—as in *Benninghoff*, the disclaimer in the Agreement does not negate the fact Britton provided legal advice under the Agreement to Riggs and Cloudbreak, in addition to the business counsel and negotiation services he performed.[8]

---

[8] *People v. Gionis* (1995) 9 Cal.4th 1196, relied on by Britton, is inapposite. There, the defendant contacted a friend who was an attorney regarding a divorce proceeding initiated by the defendant's wife. (*Id.* at p. 1203.) The attorney advised the defendant he could not represent him because of a conflict, but they subsequently met to discuss the divorce. (*Ibid.*) In later litigation, the defendant claimed his statement to the attorney at the meeting that his wife "'had no idea how easy it would be for him to pay somebody to really take care of her'" was a protected attorney-client communication. (*Ibid.*) The Supreme Court held the statement was not protected, reasoning the attorney's "unequivocal refusal to represent defendant, made before any of the incriminating disclosures were made, detracts significantly from defendant's claim of privilege." (*Id.* at p. 1212.) As

Britton also relies on the November 7, 2000 email Riggs prepared for Britton to send to the owner of Castaway stating, "I would like to speak to you directly regarding finding ways for . . . you to work with [Burnett] and [Riggs]. I am not their attorney and I am not part of their law firm, Irell & Manella. . . . I from time to time answer questions for them as a 'friend of the court.'" In his deposition, Riggs testified as to the email, "[Burnett] asked me to make sure [Britton] said that he doesn't represent both of us. He didn't want any impression that [Britton] represented Mark Burnett, so he said, 'Tell them that he doesn't represent both of us.'" Burnett was correct that Britton did not represent him—the Agreement was between Britton and Cloudbreak, with Riggs acting on behalf of Cloudbreak. Moreover, in providing his services to Cloudbreak, Britton performed multiple roles, some legal, and some not. It is clear from the email to Castaway's owners that Britton was reaching out "to find a business resolution instead of a legal one." The fact Britton was acting in a business capacity in talking to Castaway's owners does not mean Britton did not provide legal advice to Cloudbreak and Riggs in other contexts, as shown by Britton's many emails, memoranda, and comments on attorney correspondence showing just this.

Britton relies on *Zelkin v. Caruso Discount Corp.* (1960) 186 Cal.App.2d 802 to support his argument that his participation in negotiations under the Agreement was not legal

discussed, the disclaimer in the Agreement was not effective to prevent an attorney-client relationship from forming, and thus there is no "unequivocal" evidence that an attorney-client relationship was not formed.

work because he did not "do any legal research or cite cases." *Zelkin* is distinguishable. There, the Court of Appeal affirmed the trial court's determination an accountant did not practice law in representing his client before the Internal Revenue Service, reasoning, "In this case plaintiff testified that he read no law nor did he cite any to the Internal Revenue agent, thus he could be said to have been practicing law only if on the face of the problem which he was negotiating no discussion of that problem would be possible without reference to legal issues and no persuasive argument could be made which did not include a discussion of legal principles." (*Id.* at p. 806.) Although legal research may constitute evidence of the practice of law, Britton cites to no authority, nor is there, for the proposition such evidence is required to show an attorney-client relationship. Rather, as discussed, where the resolution of "'difficult or doubtful legal questions'" reasonably require "'the application of a trained legal mind,'" the attorney is providing legal services. (*Baron v. City of Los Angeles, supra*, 2 Cal.3d at p. 543.) Britton repeatedly provided this type of analysis of difficult legal questions.

Because Britton provided legal services under the Agreement as a matter of law, the trial court erred in granting Britton's motion for summary adjudication. Britton carried his initial burden based on the Agreement and Britton's declaration to show there was no attorney-client relationship between him and Cloudbreak and Riggs. But Cloudbreak and Riggs met their burden to show Britton provided legal advice and other services to Cloudbreak and Riggs based on the undisputed evidence submitted in opposition to the motion. Based on the same evidence, Riggs and Cloudbreak met their burden in their motion for summary adjudication of Britton's breach of contract claim to

37

show an attorney-client relationship (and thus the Agreement was voidable under section 6147), and Britton did not carry his burden to present evidence demonstrating there is a triable issue of material fact. Therefore, the court also erred in denying Riggs and Cloudbreak's motion for summary adjudication based on the absence of an attorney-client relationship.

C.    *The Agreement Provides for a Contingency Fee*

Britton alternatively contends that even if an attorney-client relationship existed between him and Cloudbreak (or Riggs), the Agreement does not fall within the requirements of section 6147, and thus is not voidable, because it is not a contingency fee agreement. Section 6147, subdivision (a), provides that where "[a]n attorney . . . contracts to represent a client on a contingency fee basis," the written contract shall include, among other things, a "statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract" and, in cases other than medical malpractice, "a statement that the fee is not set by law but is negotiable between attorney and client." Under section 6147, subdivision (b), "[f]ailure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee."

Britton argues the Agreement is not a contingency fee agreement within the meaning of section 6147 because it does not condition Britton's right to payment on Britton achieving a particular result for Cloudbreak. "[S]ection 6147 encompasses contingent fee arrangements regarding litigation and

38

transactional matters." (*Arnall v. Superior Court* (2010) 190 Cal.App.4th 360, 368.) "As section 6147 does not define 'contingent fee," we look first to the term's 'plain meaning' for guidance on these questions. [Citation.] The term 'contingency fee contract' is ordinarily understood to encompass any arrangement that ties the attorney's fee to successful performance, including those which incorporate a noncontingent fee based on a fixed rate of payment." (*Arnall*, at pp. 369-370; see *Estate of Stevenson* (2006) 141 Cal.App.4th 1074, 1084 ["Fees under a contingency fee agreement are not a sure thing."].)

Contrary to Britton's assertion, a contingency fee agreement need not condition the attorney's fee on the achievement of a particular result. Here, the Agreement is a contingency fee agreement because it "ties [Britton's] fee to successful performance" in that Britton's services were designed to increase DJB's earnings on *Survivor* and other projects performed in collaboration with Cloudbreak, thereby increasing the amount of money flowing to Cloudbreak and ultimately to Britton. Britton argues the Agreement entitled him to compensation "regardless of the outcome of his services," but Britton would have received nothing if DJB's deals with CBS fell through. Britton's assistance enabled Cloudbreak and DJB to secure the production of future cycles of *Survivor* at CBS. This was not a foregone conclusion because the arbitration clause of the *Survivor* agreement (according to Britton's interpretation) allowed CBS to walk away from the arbitration decision if it was not satisfied with the result. Britton also advised Cloudbreak over disputed funds withheld by CBS as costs during *Survivor*'s first cycle. If Britton's services proved effective, the distribution of those funds to DJB would redound to Cloudbreak (which was

39

entitled to 10 percent of DJB's compensation on the project), thereby increasing Britton's fee. If his services were not effective and no payment was made by CBS to DJB, Britton would receive nothing.

Likewise, Britton provided services with respect to DJB's dispute with Castaway to ensure Castaway's claims did not upset the deal between DJB and NBC over *Destination Mir*. If the deal failed, Britton would not receive a fee. And Castaway's claims to a greater share of the *Survivor* earnings would impact DJB, and thus Cloudbreak and Britton. Britton's fee was therefore contingent on his successful performance of these services. Because Britton provided legal services to Cloudbreak under the Agreement, which provided for a contingent fee, the Agreement was voidable at Cloudbreak's option under section 6147, subdivision (b), for failure to comply with subdivision (a).[9]

---

[9] Because we reverse the judgment for Britton, we do not reach Riggs and Cloudbreak's contention the trial court erred in denying their postjudgment motion for attorneys' fees.

## DISPOSITION

We reverse the judgment.  The trial court is ordered to vacate its order granting Britton's motion for summary adjudication and to enter an order denying the motion.  The trial court is further ordered to vacate its order denying Riggs and Cloudbreak's motion for summary adjudication of Britton's breach of contract cause of action and to enter an order granting the motion as to that cause of action.  The matter is remanded for further proceedings consistent with this opinion.  Riggs and Cloudbreak are entitled to recover their costs on appeal.


                                    FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.